UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-13225-GAO

ALFREDO ARAUJO,
Plaintiff,

v.

UGL UNICCO-UNICCO OPERATIONS,
Defendant.

ORDER
March 28, 2016

O'TOOLE, D.J.

The magistrate judge to whom this matter was assigned has recommended that summary judgment enter in favor of the defendant, DTZ, Inc.,[1] on all of the plaintiff's claims. No objections were filed to the magistrate judge's Report and Recommendation ("R&R"). After reviewing the relevant pleadings, briefing, and papers, as well as the R&R, I ADOPT the R&R (dkt. no. 76) in its entirety. The defendant's Motion for Summary Judgment (dkt. no. 55) is GRANTED. Judgment shall enter for the defendant.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

---

[1] Pleadings filed by the plaintiff identify his former employer, the defendant, as "UGL Unicco-Unicco Operations." The defendant's current name is DTZ, Inc. Previously, athenahealth, Inc. was a defendant in this case, but all claims against it were dismissed without prejudice (dkt. no. 40). The plaintiff did not file an amended complaint, and athenahealth remained dismissed.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALFREDO ARAUJO,                                    )
                                                   )
            Plaintiff,                             )
    v.                                             )        CIVIL ACTION
                                                   )        NO. 13-13225-GAO
UGL UNICCO-UNICCO OPERATIONS,                      )
                                                   )
            Defendant.                             )

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

March 8, 2016

DEIN, U.S.M.J.

### I.  INTRODUCTION

Plaintiff Alfredo Araujo ("Araujo") has brought this action pro se against his former

employer, DTZ–UGL Unicco ("DTZ"),[1] and athenahealth, Inc.  Although he did not allege any

specific causes of action in his Verified Complaint, it is undisputed that he has asserted claims

against the defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

and/or Mass. Gen. Laws ch. 151B.  Specifically, the plaintiff is claiming that the defendants

discriminated against him on the basis of his race (Hispanic) and national origin (Dominican

Republic) when he was employed as a cleaning and maintenance supervisor at the "Arsenal on

the Charles" property in Watertown, Massachusetts.  He is also claiming that the defendants

---

[1] DTZ, which was previously known as UGL Services Unicco Operations Co., has been named in the
plaintiff's pleadings as "UGL Unicco-Unicco Operations."  For purposes of this Report and Recommenda-
tion, the court will refer to that defendant as DTZ.

retaliated against him after he complained about the discriminatory treatment.  On September

30, 2014, the action against athenahealth was dismissed.  (Docket No. 40).[2]  The matter is

presently before the court on DTZ's motion for summary judgment by which it is seeking

judgment as a matter of law on all claims brought against it.  (Docket No. 55).

There is no question that the plaintiff passionately believes that he was wrongfully

treated by his employer, who transferred him out of Watertown, and then to other locations.

Nevertheless, even assuming, arguendo, that the plaintiff has established a prima facie case of

discrimination (which this court does not find), Araujo has failed to establish either that his

employer's legitimate, non-discriminatory reasons for its actions were pretextual, or that DTZ

acted with discriminatory intent.  Therefore, and for the reasons detailed more fully herein,

this court recommends to the District Judge to whom this case is assigned that the motion for

summary judgment be allowed.

## II.  STATEMENT OF FACTS[3]

Plaintiff Araujo was employed by defendant DTZ, an outsource provider of custodial,

maintenance, and other services.  (DF ¶¶ 1-2).  He was hired as a cleaner in 2002, and became a

---

[2] The action against athenahealth was dismissed without prejudice, but the plaintiff did not file an amended complaint although authorized to do so.  (See Docket Nos. 31, 40).

[3] Unless otherwise indicated, the facts are derived from the following materials: (1) Defendant's Local Rule 56.1 Statement of Facts (Docket No. 56) ("DF"); (2) the Affidavit of Andrew C. Pickett, Esq. (Docket No. 58) ("Pickett Aff.") and the exhibits attached thereto ("Pickett Ex. ___"); (3) the Affidavit of Roberta Newcomb (Docket No. 59) ("Newcomb Aff.") and the exhibits attached thereto ("Newcomb Ex. ___"); (4) Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Facts (Docket No. 64) ("PR"); (5) the Affidavit of Wilfredo Ferreira (Docket No. 65) ("Ferreira Aff."); (6) the Affidavit of Ana A. Araujo (Docket No. 66) ("Araujo Aff."); (7) the Affidavit of Alfredo Araujo Olivo (Docket No. 71) ("Olivo Aff."); and (8) the Affidavit of Wellington Alex Pena (Docket No. 74) ("Pena Aff.").  For the reasons set forth in footnote 7 infra, this court has denied DTZ's request to strike Mr. Pena's Affidavit.

shift supervisor in September 2008.  (DF ¶¶ 3-4; PR ¶ 4).  As further detailed below, Araujo's

employment with the company ended on October 17, 2014.  (DF ¶ 5).

In 2008, plaintiff was scheduled to be transferred by DTZ to work as a shift supervisor at

the "Arsenal on the Charles" property in Watertown, Massachusetts.  (DF ¶ 6).  According to

the defendant, the transfer was delayed two weeks due to a complaint by a fellow employee,

which was eventually found to raise insufficient concerns to prevent the transfer.  (DF ¶¶ 7-11).

The plaintiff denies having had any knowledge of the alleged complaint, and strenuously denies

the substance of the complaint.  (See PR ¶¶ 7-11).  In any event, it is undisputed that the

property manager for Arsenal on the Charles wanted the plaintiff at the property, and that

Araujo was assigned as the shift supervisor there.  (DF ¶ 10).  His hours were generally 2:00 PM

to 10:00 PM, but on occasion he started work at noon.  (DF ¶ 12).

Some time prior to September 2010, the plaintiff and his manager, Alex Pena, had their

access to athenahealth's space at the Arsenal on the Charles property discontinued, at athena-

health's request.  (DF ¶ 13; PR ¶ 13).  According to the plaintiff, he had turned in his access card

before DTZ discontinued it, so he was not initially concerned about the matter.  (PR ¶ 15).  The

defendant contends that athenahealth provided two reasons for its request.  First, that the

plaintiff was seen on a video throwing out confidential documents with the regular trash, which

was against athenahealth's policies, and, second, that female cleaners who reported to him had

entered male bathrooms while they were occupied and did not leave on at least two occasions.

(DF ¶ 14).  Plaintiff strenuously denies the accuracy of these charges.  He contends that there is

no such video, and that any video that exists makes it clear that he is not the one throwing out

the trash. He also argues strenuously that the female cleaners did not report to him, and that he was not responsible for their work. (PR ¶ 14; Pl. Mem. (Docket No. 67) at 3-4).

It is plaintiff's contention that athenahealth was discriminating against him because he is dark skinned and Dominican. (Pl. Mem. at 3-4). In particular, plaintiff contends that athenahealth's Office Manager, Antonio Costa ("Costa"), was motivated by his dislike of Araujo's skin color and deficiency in English. (Compl. (Docket No. 1) ¶¶ 1-5, 9-10). According to plaintiff's MCAD charge, which Araujo filed prior to bringing the instant action, Costa is Portuguese and has fair skin.[4] Araujo contends that Costa was supported by Lou Amaral ("Amaral"), DTZ's Director of Operations. (Compl. ¶¶ 1-2). Other than his belief as to their motives, however, the plaintiff has not put forth any objective evidence of discriminatory animus on the part of Amaral and Costa. Plaintiff asserts that DTZ's decision to bar him from athenahealth's property, and later to remove him from Watertown entirely, was done to appease athenahealth, DTZ's largest client. (Pl. Mem. at 3-4).

According to the defendant, in February 2011, DTZ was notified by the property management company for Arsenal on the Charles that DTZ's services at the property were suffering because the plaintiff and Mr. Pena were not permitted access to athenahealth. (DF ¶ 17). As a result, DTZ had to pull managers in from other accounts to service the athenahealth facility. (DF ¶ 18; Newcomb Aff. ¶ 14).[5] Araujo admits that he was denied access to athena-

---

[4] The plaintiff's MCAD charge is discussed more fully in this court's Report and Recommendation on athenahealth's Motion to Dismiss. (Docket No. 31). The MCAD dismissed the charge with a finding of no probable cause. (See Pickett Aff. Ex. B (pages from transcript of second day of plaintiff's deposition) at 125-27).

[5] Roberta Newcomb is DTZ's Director of Human Resources, New England Region. (Newcomb Aff. ¶ 1).

health. (PR ¶ 19). He denies, however, that one shift supervisor had to have access to all of the businesses at the Arsenal on the Charles site. (Id.).

It is undisputed that there was an operational reorganization at the Arsenal on the Charles location, although the plaintiff disputes the facts presented by the defendant. According to DTZ, it consolidated the supervisory role into a single position that could be filled by someone who could work on all of the tenants' properties. (DF ¶ 19). It further contends that Mario Guy was selected to serve in the consolidated supervisory role because he had significant relevant experience and could access all of the tenants' properties. (DF ¶ 22). Mr. Guy, who is Hispanic, had at least 20 years of experience managing cleaning services for commercial properties. (Id.). The plaintiff has never met Mr. Guy, and has never even seen him. (DF ¶ 23). Nevertheless, he claims that Mr. Guy was selected to replace Mr. Pena as the area manager, and that a Mr. Nelson became the shift supervisor. (PR ¶ 22). The plaintiff has provided no information about Mr. Nelson other than that he is a light skinned individual. (Id.).

On or about March 4, 2011, DTZ informed Araujo that he would be leaving Arsenal on the Charles, although he did not actually leave until August 29, 2011. Defendant characterizes this as a transfer, while the plaintiff states that he was offered a new position rather than a transfer. (DF ¶ 20; PR ¶ 20). Plaintiff admitted at his deposition that prior to leaving Arsenal on the Charles, he was offered a position for which he would have been paid a higher hourly rate, but he declined that offer. (DF ¶ 21; Pickett Aff. Ex. B at 71-75). On August 29, 2011, Plaintiff was given a letter, in English and in Spanish, which provided in relevant part as follows:

> Please be advised that based upon operational needs, effective immediately, you are being reassigned to work as a shift supervisor in the Special Services division of UGL Services which is located at 219 Williams Street, Chelsea MA.

-5-

> Your salary will remain at $16.00 per hour. In this position you will report
> directly to Vence Pires.

(Pickett Aff. Ex. C). Mr. Pena was also notified on August 29, 2011, that he was being trans-
ferred to a different location as well. (DF ¶ 26).

Plaintiff apparently objected to reporting to Mr. Amaral and Mr. Pires, and objected to
the way in which the reassignment to Chelsea was handled, especially in that he was allegedly
told not to return to the Arsenal on the Charles property. (Compl. ¶ 5K & Ex. 15). At the
Chelsea location, Araujo worked from about 1:00 or 2:00 PM until 10 PM. (DF ¶ 27; PR ¶ 27).
Therefore, his hours were roughly the same as they were when he worked at the site in
Watertown. According to the defendant, the plaintiff requested a transfer from Chelsea
because commuting to Chelsea was difficult for him. (DF ¶ 29). While Araujo denies requesting
a transfer (PR ¶ 29), there is no evidence that he wanted to stay there. In any event, it is
undisputed that the plaintiff worked in Chelsea for only a few weeks, and that in or about
September 2011, he was transferred to work at a property in Everett where Mellon Bank was
located. (DF ¶ 30). The defendant asserts that while he was working in Everett, Araujo
remained employed as a supervisor, and received the same rate of pay, but that his hours
changed. (DF ¶ 31). Plaintiff claims that he worked for Mellon Bank both in Everett and in
Boston, and that while his pay was unchanged, DTZ altered both his work schedule and his title.
(PR ¶¶ 30-31).

According to the defendant, in February 2012, Mellon Bank stated that it required a
shift supervisor who was fluent in English and was able to operate a computer and set up
audiovisual equipment. (DF ¶ 32). It is undisputed that Araujo is not fluent in English, although

he claims to speak enough English to do his job.[6] (PR ¶ 66).  He also asserts that he was

working in housekeeping rather than as a shift supervisor, and that he was not required to

operate a computer or set up audiovisual equipment.  (PR ¶ 32).  Nevertheless, Araujo does not

dispute that Mellon Bank actually made this request.

By letter dated March 2, 2012, the plaintiff was formerly offered "a position as full time,

second shift, supervisor for UGL Services at Staples Corporate Headquarters in Framingham,

Massachusetts effective on Wednesday, March 7, 2012." (Newcomb Aff. Ex. 1).  In connection

with the transfer to Framingham, Araujo's pay rate remained $16 per hour, payable weekly,

and he received the same benefits package.  (Id.).  Nevertheless, Araujo claims that he objected

to this transfer, and that it involved a different job title and work schedule.  (PR ¶ 33).  He also

contends that it involved an improper move from a metropolitan area to an urban area.  (Id.).

Plaintiff worked at the Framingham location for less than one month.  (DF ¶ 37).  While

there, he continued to work the 2:00 to 10:00 PM shift.  (Id.).  Usually, Araujo received rides

from his wife or daughter, although he occasionally drove himself.  (DF ¶ 38).  The plaintiff

contends that he had difficulties driving at night.  (DF ¶¶ 35-36).  However, the parties disagree

as to whether the plaintiff submitted medical evidence to support his contention that he was

having problems with night driving.  (See PR ¶ 35).  In any event, Araujo was offered a position

at Faneuil Hall in Boston soon after he objected to the Framingham location.  (DF ¶ 39).  As

detailed in a letter to the plaintiff dated March 28, 2012, which Araujo countersigned:

> In accordance with your specific request to be placed in an account in the
> Metropolitan Boston area, we were able to identify a position for you at the
> Faneuil Hall account.  Effective immediately, you will be transferred to work

---

[6] Araujo's son translated for him during all court hearings.

full-time, second shift, Supervisor for UGL services at Faneuil Hall in Boston, Massachusetts.

(Pickett Aff. Ex. E). Araujo's hourly rate and benefits continued to remain the same. (Id.).

At Faneuil Hall, plaintiff maintained the title of shift supervisor. (DF ¶ 41). However, he contends that his work schedule varied during the week. (PR ¶ 42). There is no dispute that Araujo remained at that location until October 17, 2014, when DTZ lost the Faneuil Hall contract. (DF ¶¶ 43-46). Plaintiff contends that DTZ did not give him the option of transferring to another location. (PR ¶ 46). However, it is undisputed that he began working for Compass, the company that took over the cleaning contract for Faneuil Hall, immediately after DTZ left. (DF ¶ 47). At the end of his employment with DTZ, plaintiff was earning $16.50 per hour. His pay at Compass was $17.05 per hour, but, according to the plaintiff, the benefits were not as good. (DF ¶ 48; PR ¶ 48).

Only one supervisor from Faneuil Hall continued to work at DTZ. (DF ¶¶ 49-50). According to the defendant, that individual, who was from Cape Verde, accepted a lower paying position with DTZ. (DF ¶ 50). The plaintiff contends that this individual had less experience and less seniority than he did, and that this individual "is of the same race and color skin as Mr. Tony Andrade and Mr. John Barros." (PR ¶ 49). However, at his deposition, the plaintiff testified that Mr. Barros was "dark, like me" and that he thought Mr. Barros was from Cape Verde. (Pickett Aff Ex. B at 132-33). Plaintiff does not dispute that no one at DTZ ever said anything to him that was negative about Dominicans. (DF ¶ 68).

There is an employee handbook at DTZ, which addresses work assignments. Araujo claims that he received a copy of it, but not until August 29, 2011. (PR ¶ 57). At a minimum, therefore, he received the handbook more than three years before his employment with the

-8-

company terminated.  According to the Work Site Guidelines contained in the handbook, DTZ

maintains the right to transfer employees.  As the handbook provides:

> **Your work assignment is subject to change**.  You will be assigned specific
> tasks and responsibilities.  However, consistent with UGL Services' opera-
> tional needs and objectives you may be asked to change jobs (for which you
> are qualified) or assignments.

(Newcomb Aff. Ex. 2).  Plaintiff claims that at times during his employment with DTZ, he was

transferred to positions for which he lacked skills, such as those of carpenter or electrician.  (Pl.

Mem. at 3).  However, there is no evidence in the record that the plaintiff was unable to

perform his job duties as a shift supervisor for the defendant.

## Plaintiff's Evidence

The plaintiff has submitted affidavits in support of his opposition to the motion for

summary judgment.  Specifically, he has submitted the affidavit of Wilfredo Ferreira, who was

the area manager when the plaintiff was hired on September 1, 2008 to work as a shift

supervisor at the Arsenal on the Charles property.  (Docket No. 65).  This affidavit does not

provide any substantive information which is relevant to the summary judgment motion.

Araujo also submitted the affidavit of Ana A. Araujo, who apparently is the plaintiff's

daughter.  (Docket No. 66; Pickett Aff. Ex. B at 33).  She asserts that DTZ transferred her away

from the Arsenal on the Charles property after she served as a translator for the plaintiff at the

MCAD.  (Araujo Aff. ¶¶ 5-9).  However, she does not provide any information about how the

plaintiff was treated at work.  Therefore, her testimony fails to raise any disputed issues of fact.

The plaintiff filed the affidavit of his son, Alfredo Araujo Olivo, as well.  (Docket No. 71).

Again, his son does not provide any information about how the plaintiff was treated in the

context of his employment.  Rather, he asserts that he was threatened by Mario Guy when he

-9-

refused to clean two refrigerators that were not part of his duties. (Olivo Aff. ¶¶ 3-4). That information does not address any facts material to the plaintiff's claims in this action.

Finally, the plaintiff has submitted the affidavit of Wellington Alex Pena who was the former area manager for DTZ. (Docket No. 74).[7] Mr. Pena confirmed that, at a meeting on March 3, 2011, Mr. Amaral told the plaintiff that the fact that athenahealth did not want him at the Arsenal on the Charles property was the reason he was going to be transferred. (Pena Aff. ¶ 8). He also confirmed that, at a meeting on August 29, 2011, the plaintiff was told by Roberta Newcomb of DTZ not to return to the Watertown property. (Id. ¶ 9). Finally, Mr. Pena says that he had never seen anyone treated like the plaintiff "unless a criminal action was involved" and that it seemed "more as a hate from Defendant to Plaintiff."[8] (Id. ¶ 10). However, Mr. Pena has presented no facts to indicate that any animosity toward Araujo was based on the plaintiff's race or national origin.

Additional facts will be provided below where appropriate.

### III. ANALYSIS

#### A.   Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[7] The defendant has requested that this court strike this affidavit on the grounds that it is untimely and contains inadmissible hearsay. (Docket No. 75). Given the plaintiff's pro se status, the request to strike will be denied. This court agrees with the defendant, however, that the affidavit does not create disputed issues of fact.

[8] It is not clear whether the reference to "Defendant" is to athenahealth or DTZ.

matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d

265 (1986) (quotation and citation omitted).  As the First Circuit recently explained:

> Although we will draw all reasonable inferences in the nonmovant's favor,
> we will not "draw *unreasonable* inferences or credit bald assertions, empty
> conclusions, rank conjecture, or vitriolic invective." *Caban Hernandez v.*
> *Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).  It bears repeating that
> genuine issues of material fact "are not the stuff of an opposing party's
> dreams," *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991), and a
> party cannot successfully oppose a motion for summary judgment by resting
> "upon mere allegations or denials of his pleading," *LeBlanc v. Great Am. Ins.*
> *Co.*, 6 F.3d 836, 841 (1st Cir. 1993) (internal quotation marks omitted).  If a
> nonmovant bears the ultimate burden of proof on a given issue, [he] must
> present "definite, competent evidence" sufficient to establish the elements
> of [his] claim in order to survive a motion for summary judgment.  *Mesnick*,
> 950 F.2d at 822.  This is no less true in discrimination and retaliation cases
> where motive is at issue;  a nonmovant cannot rely "merely upon conclusory
> allegations, improbable inferences, and unsupported speculation." *Dennis*
> *[v. Osram Sylvania, Inc.]*, 549 F.3d 851, 855-56 (1st Cir. 2008)] (internal
> quotation marks omitted); *Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.*,
> 31 F.3d 9, 14 (1st Cir. 1994).

<u>Pina v. Children's Place</u>, 740 F.3d 785, 795-96 (1st Cir. 2014).

The standard of proof that the plaintiff must meet is well established.  As the <u>Pina</u> court

explained further:

> Where, as here, there is no direct evidence of discrimination, a plaintiff
> seeking to establish a prima facie case of race discrimination . . . must
> successfully navigate the familiar *McDonnell Douglas* burden shifting
> framework. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir.2001).
> The burden of production starts with the plaintiff.  In order to establish a
> prima facie case of discriminatory termination, a plaintiff must show: 1) she
> was a member of a protected class, 2) she was qualified for her position,
> 3) she was subjected to an adverse employment action, and 4) the position
> remained open or was filled by someone with similar qualifications. *Id.*  Such
> a showing creates a rebuttable presumption that the employer engaged in
> discrimination.  This is not the end of the matter, however, and if the
> employer is able to articulate a legitimate, non-discriminatory reason for the
> termination, the presumption of discrimination disappears. *Id.*; *see also*
> *LeBlanc*, 6 F.3d at 842.  At the third and final stage of the *McDonnell Douglas*
> paradigm, the burden of production returns to the plaintiff, who must offer

> evidence that the defendant's explanation is pretextual and that discrimina-
> tory animus prompted the adverse action. *Conward v. Cambridge Sch.*
> *Comm.*, 171 F.3d 12, 19 (1st Cir.1999). The burden of persuasion remains on
> the plaintiff at all times. *Mariani–Colón v. Dep't of Homeland Sec. ex rel.*
> *Chertoff*, 511 F.3d 216, 221 (1st Cir.2007).

740 F.3d at 796 (footnote omitted).[9]

Applying these principles to the instant case compels the conclusion that the

defendant's motion for summary judgment should be allowed.

### B.     Prima Facie Case of Discrimination

The defendant argues that the plaintiff cannot establish a prima facie case of discrimina-

tion because he cannot prove that he suffered an adverse employment action, or that his

employer sought someone of roughly equivalent qualifications to perform substantially the

same work. See Aly v. Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 46 (1st Cir. 2013)

(describing elements of a prima facie case). The "prima facie showing is not especially burden-

some[.]" Melendez v. Autogermana, Inc., 622 F.3d 46, 50 (1st Cir. 2010) (quoting Woodman v.

Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995)). While the question is a close one, in

the instant case, this court finds that there are disputed facts which preclude the defendant

---

[9] The standard of proof that the plaintiff must meet in order to prevail on a discrimination claim under Massachusetts law is somewhat more relaxed than the federal standard. Under federal law, at stage three of the burden-shifting framework, the plaintiff must present evidence showing both that the defendant's non-discriminatory reason for the adverse employment action was pretextual "and that discriminatory animus prompted the adverse action." Pina, 740 F.3d at 796 (emphasis added). Under Mass. Gen. Laws ch. 151B, however, the plaintiff need only establish pretext at the third stage of the analysis. See Bulwer v. Mount Auburn Hosp., --- N.E.3d ---, 2015 WL 10376073, at *6 (Mass. Feb. 29, 2016) (explaining that "Massachusetts is a pretext only jurisdiction" (quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 443, 646 N.E.2d 111 (1995)). Therefore, "[t]o survive a motion for summary judgment [under ch. 151B], the plaintiff need only present evidence from which a reason-able jury could infer that 'the [defendant's] facially proper reasons given for its action against him were not the real reasons for that action.'" Id. at *7 (quoting Wheelock Coll. v. MCAD, 371 Mass. 130, 139, 555 N.E.2d 309 (1976)).

from prevailing, at the summary judgment stage, on the basis that the plaintiff has not suffered an adverse employment action. This court agrees, however, that the plaintiff has not established that he was replaced by someone with equivalent qualifications.

### Adverse Employment Actions

"[A]dverse employment actions" encompass such adverse changes in employment as "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998). To constitute an adverse employment action, the change in working conditions must be material. See Rafalski v. Donahoe, No. 10-cv-40060-TSH, 2012 WL 4753274, at *6 (D. Mass. Oct. 3, 2012), and cases cited. Thus, "a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002), and cases cited. It is not enough that an employee feels "stigmatized and punished" by a transfer. A more "tangible change in duties or working conditions is needed" before a court will conclude "that the transfer was, in substance, a demotion." Id. at 25 (internal quotation marks and citation omitted).

In the instant case, the defendant argues that any changes in the plaintiff's conditions of employment were minimal, and that the majority of his job responsibilities, as well as his pay and benefits, remained the same after each of the transfers at issue in the case. The plaintiff claims that the various transfers from Watertown to Chelsea, Everett, Framingham and ultimately Boston resulted in substantially different schedules, job responsibilities and job titles. He also has submitted evidence showing that his schedule varied once he left Watertown. (See

-13-

PR ¶¶ 27, 28, 30-33, 42). Moreover, the plaintiff claims that he had a lot of trouble getting to these other locations, either because of a lack of public transportation or an inability to obtain rides, and that he was being asked to do different work than the work he performed at Arsenal on the Charles.

Admittedly, there is no evidence in the record that shows that the plaintiff was unable to travel to the new locations on a regular basis, or that the transfers resulted in excessive absenteeism. Nor is there any evidence showing that the plaintiff was penalized for being unable to carry out his job.[10] The plaintiff's pay and benefits remained the same, or increased, and not every change in working conditions forms the basis for a discrimination claim. See Marrero, 304 F.3d at 23, and cases cited. Nevertheless, the plaintiff has put forth some evidence to indicate that his schedule, title and job responsibilities changed upon his transfer to the new locations. (See, e.g., PR ¶¶ 33, 42 & Exs. 2, 3). Although DTZ asserts that there were no significant changes, "[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry . . . cast in objective terms." King v. City of Boston, 71 Mass. App. Ct. 460, 470, 883 N.E.2d 316, 324 (2008) (quoting Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)). Here, the nature and scope of the changes to Araujo's schedule and job duties are not sufficiently developed to say, as matter of law, that no adverse employment action took place. See Amery v. Potter, 497 F. Supp. 2d 134, 142 (D. Mass. 2007) (finding it "at least arguable" that plaintiff's schedule change "– which effectively eliminated plaintiff's two-day

_____

[10] To the extent that the plaintiff was unable to meet the requirements of Mellon Bank, it appears to be the plaintiff's position that these requirements were unusual for someone in his position. After Mellon Bank identified its needs for the position, DTZ transferred the plaintiff to a location where he was able to meet all the job requirements. There is no evidence which would support a conclusion that DTZ transferred Araujo to the Mellon Bank facility in an effort to have him fail.

weekend – rises to the level of an adverse employment action"); King, 71 Mass. App. Ct. at 470,
883 N.E.2d at 325 (evidence that plaintiffs were denied rank-specific locker facility was suffi-
cient to withstand summary judgment in favor of defendant on issue of adverse employment
action). Accordingly, while the question, as noted above, is a close one, this court finds that
there are material facts in dispute to preclude the entry of summary judgment on the issue
whether the plaintiff suffered an adverse job action.

### Qualifications of Plaintiff's Replacement

The defendant also contends that the plaintiff cannot meet his burden of establishing a
prima facie case because he was not replaced by someone with roughly equivalent qualifica-
tions following any of the transfers. This court agrees.

First, the defendant contends that the plaintiff was replaced by Mario Guy at the
Watertown location. It appears that Mr. Guy, an Hispanic male, had qualifications substantially
greater than the plaintiff's, and was able to have access to all of the locations at the Arsenal on
the Charles site. To the extent the plaintiff is arguing that he was replaced by Mr. Nelson rather
than Mr. Guy, he has failed to establish that Mr. Nelson had qualifications comparable to his
own. Thus, the plaintiff has not established that he was replaced in Watertown by someone of
roughly equivalent qualifications.

Defendant next argues that the plaintiff was transferred from Chelsea to Everett at his
own request, and therefore cannot complain about the transfer. While the plaintiff denies that
he requested the transfer, he has not asserted that he wanted to stay in Chelsea. Nor has he
claimed that he was improperly replaced at that location.

The evidence in the record is that the plaintiff's transfer from Everett to Framingham occurred because Mellon Bank requested a shift supervisor who was fluent in English, able to operate a computer, and able to set up audiovisual equipment. While the plaintiff believes that he should not have needed such qualifications, he does not dispute that he does not have them. Again he has not established that he was replaced by someone with comparable qualifications.

Araujo's final transfer from Framingham to Boston was due to transportation problems that he was having. He does not contend that he was improperly replaced at that location.

Finally, with respect to plaintiff's separation from employment after DTZ lost the Faneuil Hall contract, Araujo argues that he was not given the opportunity to stay with DTZ while another individual with lesser qualifications was able to retain a position with the company. However, he has not established any right to remain employed by DTZ. More importantly, because DTZ no longer had any employees at the Faneuil Hall site, the plaintiff cannot establish that he was improperly replaced at that location. For these reasons, this court concludes that the plaintiff has not met his burden of establishing a prima facie case of employment discrimination.

## C.    Pretext and Discriminatory Animus

Even if it were assumed that the plaintiff had met his burden of establishing a prima facie case of discrimination, the burden would then shift to the employer to offer "a legitimate, non-discriminatory reason" for its actions. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (quoting Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999)). Here, the defendant has met this burden. Moreover, Araujo has not presented sufficient facts

-16-

to show that DTZ's non-discriminatory reasons for transferring him to various work sites were false.

With respect to the transfer from Watertown to Chelsea, the defendant has established that the plaintiff was precluded from working at athenahealth, one of the largest tenants at the Arsenal on the Charles property. While Araujo has challenged the accuracy of athenahealth's accusations against him, he does not deny that the complaints were made. Nor does he deny that there was some reorganization at Arsenal on the Charles involving the addition of Mr. Guy, an experienced supervisor. In short, there is no evidence which would support a finding that DTZ's articulated, non-discriminatory reason for the transfer was pretextual.

Similarly, there is no evidence from which a fact-finder could conclude that the plaintiff's subsequent transfers were pretextual. In fact, the record shows that DTZ went to great lengths to find a position that was suitable for Araujo. Whether the transfers were good fits or not, it is obvious that the defendant was not trying to terminate the plaintiff's employment or force his resignation. Nor does it matter whether or not the short-term transfers occurred at the plaintiff's request (as DTZ contends) because there is no evidence that the plaintiff wanted to stay at any of the properties to which he was assigned. Rather, the record establishes that DTZ continued to transfer him to different locations until he finally landed at Faneuil Hall where he stayed for several years.

Finally, it is undisputed that Araujo's employment in Boston ended because the defendant lost the Faneuil Hall contract. While the plaintiff appears to contend that he should have

been offered the opportunity to stay with the company, he has not developed this argument.[11] There are no facts indicating that he had any entitlement to remain employed with DTZ, and the record evidence is that virtually all Faneuil Hall employees left the company following the loss of the contract. (See Def. Mem. (Docket No. 57) at 14 n.6). Moreover, the record establishes that the plaintiff was able to continue working at Faneuil Hall at a higher rate of pay for the new company that took over the contract following DTZ's departure. Thus, the defendant has submitted "enough admissible evidence to support a rational finding that unlawful discrimination was not the cause of the employment action."[12] Straughn, 250 F.3d at 33 (quotations, citations and punctuation omitted). See also Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47 (1st Cir. 2002) ("slight suggestion of pretext" insufficient to defeat summary judgment).

Once the employer has met its burden of providing a nondiscriminatory reason for its actions, the presumption of discrimination disappears, and the burden shifts back to the employee to "persuade the factfinder that [he] experienced unlawful discrimination at the hands of [his] employer." Straughn, 250 F.3d at 34, and cases cited. To meet this burden, the plaintiff "must demonstrate either that the adverse employment action was (1) more likely motivated by discrimination than by the explanation proffered by the defendant; or (2) the proffered explanation [was] unworthy of credence where the suspect action, coupled with evidence to contrary, suggests a discriminatory motivation." Aly, 711 F.3d at 46 (internal

---

[11] Significantly, Araujo's separation from DTZ is not referenced in the complaint. Nor was it raised before the MCAD.

[12] Because Araujo has failed to present any evidence showing that DTZ's "facially proper reasons given for its action against him were not the real reasons for that action[,]" the defendant is entitled to summary judgment on his claim under Mass. Gen. Laws ch. 151B. See Bulwer, 2015 WL 10376073, at *7 (quoting Wheelock Coll. v. MCAD, 371 Mass. 130, 139, 355 N.E.2d 309 (1976)).

quotation marks and citation omitted).  Here, there is simply no evidence from which a fact-finder could reasonably infer that unlawful discrimination was a determinative factor in any alleged adverse employment action.  See Zapata-Matos, 277 F.3d at 47.  While Araujo claims that athenahealth's Office Manager and DTZ's Director of Operations were acting with a discriminatory motive when he was banned from the athenahealth property at Arsenal on the Charles, he has not submitted any evidence to support this claim other than his subjective belief.  This is not enough to defeat DTZ's evidence of a non-discriminatory motive for its decision to remove Araujo from the Watertown site.  See McBride v. MCAD, 677 F. Supp. 2d 357, 362 (D. Mass. 2009) (finding that plaintiff's speculation and conjectural statements were insufficient to support an inference of discrimination).  Nor has Araujo presented any facts to support an inference that DTZ's subsequent decisions to transfer him were motivated by discriminatory animus.  "Absent evidence rebutting defendant's legitimate, non-discriminatory reason for its action, summary judgment is appropriate."  Armery, 497 F. Supp. 2d at 142 (footnote omitted).  For this reason as well, DTZ is entitled to judgment as a matter of law with respect to Araujo's discrimination claims.

### D.    Retaliation

Finally, it appears that the plaintiff is asserting a claim of retaliation, although the contours of the claim are not clear.  "[T]o make out a prima facie case of retaliation, the plaintiff must show that he engaged in protected conduct, that he suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action."  Sisco v. DLA Piper LLP, 833 F. Supp. 2d 133, 147 (D. Mass. 2011) (quotations and citation omitted).  See also Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir 2005) (setting

-19-

forth elements of a retaliation claim under Title VII and chapter 151B). To the extent the

plaintiff is challenging his transfer from Watertown, he has not established that the transfer

was in retaliation for any protected activity. He was notified that he was going to be

transferred on March 4, 2011. However, he did not complain about his treatment at the

property before then. Nor did he file his MCAD complaint until September 9, 2011, after the

date of the transfer on August 29, 2011. "[N]o protected conduct after an adverse employment

action can serve as the predicate for a retaliation claim." Pearson v. MBTA, 723 F.3d 36, 42 (1st

Cir. 2013). Therefore, the transfer could not have occurred in retaliation for any protected

activities.

To the extent the plaintiff is challenging his other transfers, or his separation from

employment with DTZ, he has made no attempt to link those events to any protected activities.

While family members may have asserted that they were removed from Watertown for helping

the plaintiff at the MCAD, or that Mr. Guy treated them unreasonably, the plaintiff has not

asserted that DTZ's conduct towards him, after his departure from Watertown, was retaliatory.

Rather, as detailed above, the undisputed facts indicate that the company moved the plaintiff

from places where he was not particularly happy, until he reached Faneuil Hall, where he

stayed for years. Moreover, as detailed above, the plaintiff has not put forth any evidence

establishing that the employer's reasons for its employment decisions were pretextual. There-

fore, any claim of retaliation is not supported by the factual record.

## IV. CONCLUSION

Nothing herein should be interpreted to mean that the court has any opinion as to

whether DTZ's employment decisions were appropriate, and this court recognizes that the

-20-

plaintiff takes strong exception to any criticism of his employment record. "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991). For all the reasons detailed herein, this court finds that the plaintiff has not met his burden of establishing a claim of discrimination or retaliation. Therefore, this court recommends to the District Judge to whom this case is assigned that the defendant's motion for summary judgment (Docket No. 55) be ALLOWED.[13]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[13] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).